Kelly J. PATTERSON, individually, and as parent and natural guardian of Abby Ferguson, Douglas A. Patterson, and Kelly's Kids Child Care, Inc., Plaintiffs,

v.

ARMSTRONG COUNTY CHILDREN AND YOUTH SERVICES, Armstrong County, Jo Ellen Bowman, South Buffalo Township and Scott Yockey, Officer, Defendants.

CIV. A. No. 99–221.

United States District Court, W.D. Pennsylvania.

May 22, 2001.

Alexander H. Lindsay, Jr., Lindsay, Jackson & Martin, Butler, for Kelly J. Patterson, Individually and as parents and natural guardian of Abby Ferguson, Douglas A. Patterson, Kelly's Kids Child Care, Inc., plaintiffs.

Scott G. Dunlop, Paul D. Krepps, Marshall, Dennehey, Warner, Coleman & Goggin, Mark R. Hamilton, Carmen A. Martucci, Zimmer Kunz, Pittsburgh, for Armstrong County Children and Youth Services, Armstrong County, Jo Ellen Bowman, South Buffalo Township, Scott Yockey, Officer, defendants.

## MEMORANDUM OPINION

LEE, District Judge.

Before the Court are: (i) South Buffalo Township ("Township") and Officer Scott Yockey's Motion for Summary Judgment (Document No. 35); and (ii) Motion for Summary Judgment (Document No. 38) filed on behalf of Armstrong County ("County"), Armstrong County Children and Youth Services ("CYS"), and Jo Ellen Bowman. After careful consideration of these motions, the memoranda of law in support and in opposition thereto, the supporting materials offered by the parties, and the entire record in this case, the Court will grant summary judgment in favor of all defendants on plaintiffs' substantive due process claims brought pursuant to 42 U.S.C. § 1983 and their pendent state claims, but will deny the motions

with regard to plaintiffs' section 1983 procedural due process claims.

## Background

The historical facts underlying this lawsuit are not in dispute, for the most part, although the competing inferences the parties spin from those facts are wildly divergent. Putting aside the contradictory spins and inferences, for now, the mostly undisputed material facts material are as follows. During the first week of November 1998, plaintiff Kelly J. Patterson and her daughter, Abby Ferguson, approaching 15 years of age, were having an ongoing disagreement about, among other things, whether Abby could go and live with her father, Jeffrey Ferguson. Mrs. Patterson had primary custody, and pursuant to family court order, Mr. Ferguson had alternating weekends, and substantial shared custody in the summertime.

On the morning of November 6, 1998, a Friday, the escalating week-long squabble culminated in a physical altercation in the driveway of their home. After the altercation, Mrs. Patterson drove Abby to Freeport Area High School. Two of Abby's friends noticed that she was very upset, crying, and had some minor scrapes and bruises on her wrists, arms, knees and a small bump on her head. Abby told them she was upset because her mother and she had a fight.

Her friends persuaded Abby to tell the guidance counselor what had happened. Doug Stanko, the counselor, spoke with Abby who told him about the fight. Mr. Stanko asked Abby to write out a statement explaining what had happened. Abby handwrote the seven-page statement, the highlights of which are as follows.

Abby described a series of escalating arguments she had with her mother over a variety of things, but mostly about her wanting to go and live with her father.

Mrs. Patterson thought she was manipulating her parents. On one occasion, "she said she would punch me in the face and drag me to the car" if Abby wouldn't ride to school with her voluntarily. Abby Ferguson deposition, Deposition Exhibit 1, at 4. The arguments continued for about a week. On Friday, November 6, 1998, Abby told her mother she was going to go to her father's residence after school, and tempers flared.

The argument escalated, mother and daughter shouting at each other, including Abby Ferguson screaming, "Screw you." Mrs. Patterson insisted Abby would not ride the bus to school, and she was going to drive her instead. Arguing throughout the morning, eventually they headed toward the car.

By that time I'd gotten to the car & was on the steppey thing, & she came up behind me & pulled me out by my hair & faced my head down. She told me never to swear at her again. I told her to stop & let go of me & she said not 'til I said I wouldn't. We got on the ground & she clawed me & we fought until I got on top & I said, "You *don't* hit me." She got on top again, & she got my hooded sweatshirt over my face & was pulling it. I told her I couldn't breathe, & she said good. I got out of her grip, and I got at last on all fours. She clawed at my bracelets & my arm, & pulled my left arm back behind my back, and when I told her she was hurting me, she said she'd break my fingers if she had to! She put my forehead into the gravel, & I was stuck, there was nothing I could do. She had called my step-dad out, & he was standing there, just watching. I got on all four's again, & she got me down, pulled my arm back, sat on top of me, & all I could do was say that I wouldn't swear. She sat there for a few sec., then let me up. We

got into the car, and after stopping at Freeport, she took me to school. I called my dad, and he said he'd come get me. Then on my way to H.R., my friends Jenny & Deanna saw I had been crying and when I told them what happened, they took me to the guidance office.

Abby Ferguson deposition, Deposition Exhibit 1, 6–7.

Mr. Stanko reported the incident to his immediate supervisor, Assistant Principal Max Krugle. After seeing Abby and reading her statement, he requested Abby be examined by the school nurse. Abby told Mr. Krugle that she did not want to go home that night, and that she was afraid of her mother. Nurse Mary Barbara Lagiovane examined Abby, and noted the minor scratches, scrapes and bruises on her knees, hands, wrists and an abrasion on her head. Abby told Nurse Lagiovane that she was afraid to go home. Nurse Lagiovane, and Messrs. Krugle and Stanko met with the principal, Mr. Robert Schleiden, to determine the next step. Principal Schleiden spoke with Abby and confirmed the facts in her written statement. Abby indicated to the principal she was adamant about not going home to her mother. The four school officials unanimously decided that this incident had to be reported to CYS.[1]

Kelly Patterson, who owns and runs Kelly's Kids Childcare, Inc., a childcare center, concedes it was appropriate for the school officials to notify CYS pursuant to the mandatory reporting provisions of the Child Protective Services Law ("CPSL"), 23 Pa.C.S. §§ 6301—6384. Defendant Jo Ellen Bowman was the caseworker assigned by CYS to investigate the matter. She went to Freeport Area High School, read Abby's statement, interviewed her and confirmed what she had written. Ms. Bowman reviewed the nurse's report and observed the visible injuries to Abby. Abby expressed some concern about her safety and had asked Ms. Bowman not to notify her mother that CYS was involved. Bowman deposition, at 20, 28–29. Abby told Ms. Bowman "that her mother would be very angry knowing that we were involved," and "she felt that the situation that had happened that morning was going to escalate and did not feel that the situation between herself and her mother had been rectified from the altercation that they had in the morning." Bowman deposition, 28–29.

Ms. Bowman had attempted to contact Mrs. Patterson by telephone at her daycare center, but was told she was not available. Ms. Bowman then contacted several police stations in boroughs which arguably had jurisdiction over some or all of the events, including South Buffalo Township Police Department, which had jurisdiction at the Patterson–Ferguson residence. Officer Yockey was the police officer from Township who went to the school to investigate.

Kelly Patterson arrived at Freeport High School around 2:45 p.m. Patterson deposition at 72. At this point, she had no idea what had gone on at school that day,

[1]. Doug Stanko stated that Abby told him, "She was afraid and chose not to go home if given that option." Stanko deposition, at 10. Mr. Stanko's contemporaneous notes of November 6, 1998, indicated, "She is afraid of her mother and would choose to live with her father." Stanko deposition, Deposition Exhibit 1. Vice Principal Krugle testified that, while he couldn't state Abby's "exact words, ... she said she did not want to go home again tonight, and she was afraid of her mother." Krugle deposition, at 11. Principal Schleiden testified that Abby "was adamant about not going home to the mother ..." Schleiden deposition, at 12. And, Abby stated to Nurse Mary Barbara Lagiovane, "She was afraid to go home." Lagiovane deposition, at 16.

and she saw Principal Schleiden on the sidewalk and approached him. He told her he needed to speak with her, they went inside the school where there were several police officers, and the principal told Mrs. Patterson that Abby was in protective custody. Patterson deposition at 76.

According to Ms. Bowman, she tried to speak with Mrs. Patterson, who was making a phone call to her lawyer, and Mrs. Patterson could not say how long it would take for her lawyer to get to school. It was late afternoon, the high school was in a football playoff game, and everyone in the school, including the school officials, wanted to go to the game. Ms. Bowman asked Mrs. Patterson if she wanted to go to the police station to wait for her attorney, and Mrs. Patterson said no. Bowman deposition, at 16–17.

Ms. Bowman then discussed the matter with Officer Yockey and the school officials, and everyone agreed Abby Ferguson should not return home that night because they were not able to ensure her safety if she did. Bowman deposition, at 12–13, 21. Officer Yockey initiated a call to District Attorney Scott Andreassi, the district attorney for Armstrong County, who agreed Abby should be taken into protective custody, and advised Officer Yockey and Ms. Bowman to initiate that. He also advised Officer Yockey to file criminal charges against Mrs. Patterson based upon what the circumstances described to him, and Officer Yockey later filed criminal charges for simple assault, harassment, and disorderly conduct.

According to both Ms. Bowman and Officer Yockey, Yockey assumed custody of Abby Ferguson under Pennsylvania's Juvenile Act, 42 Pa.C.S. §§ 6301–6365, which was the normal procedure CYS and officers of the Township followed on weekends and after hours. Bowman deposition at 30–31. *Immediately* after assuming custody, perhaps simultaneously, Officer Yockey turned custody over to CYS/ Ms. Bowman. In the meantime, Mrs. Patterson's attorney arrived, about 30 minutes after she placed the phone call to him. After speaking with her attorney briefly, he and Mrs. Patterson told Ms. Bowman that she would like to give a statement. However, Bowman told her it was too late, that they had already taken Abby into custody, and she declined to take Mrs. Patterson's statement.

Officer Yockey telephoned District Justice Michael L. Gerheim and advised him that Ms. Bowman and Abby Ferguson were on their way down to file a petition under the Protection from Abuse Act ("PFA Act"), 23 Pa.C.S.A. § § 6101–6118. Ms. Bowman drove to the district justice's office, and assisted Abby in completing the petition. *All parties agree* that a non-emancipated minor, such as Abby Ferguson, is not authorized by the PFA Act to initiate a petition, 23 Pa.C.S. § 6106(a), and this petition and procedure were therefore flawed. Nevertheless, the district justice granted Abby Ferguson's petition, *ex parte*, and awarded custody temporarily to her father, Jeffrey Ferguson, who by then had arrived at District Justice Gerheim's office. Mrs. Patterson had not been informed about this PFA Act proceeding, nor was she notified of the order entered, although she found out on Sunday that Abby was with her father.

On Monday morning, at Ms. Bowman's suggestion, Mr. Ferguson went to the district justice's office to file a second PFA petition. In that petition, he alleged that Mrs. Patterson and Abby had gotten in a fight the previous Friday and that Abby had sustained injuries and was afraid to go home to her mother. This too was an *ex parte* proceeding, at which Mrs. Patterson was neither notified nor given an opportu-

nity to appear and contest the charges of child abuse. District Justice Gerheim granted the PFA petition for an indefinite period, again awarding emergency custody to Mr. Ferguson.

Officer Yockey filed criminal charges for simple assault, harassment and disorderly conduct against Mrs. Patterson, with the advice of the District Attorney. At the preliminary hearing on November 23, 1998, the District Attorney's office withdrew the charges. District Attorney Andreassi testified he believed there was probable cause for the charges, but believed this was primarily a domestic/custody matter better off handled through civil proceedings.

On November 18th, Mr. Ferguson withdrew his PFA petition. On November 23rd, CYS received a medical report from the Grove City Hospital indicating Abby had not suffered any serious injury, at which point CYS declared the charges of suspected child abuse to be "unfounded" and closed the case. At that point, Abby Ferguson was free to return home. However, she continued to stay with her father until Christmas day, December 25, 1998, when she returned home to her mother where she resides today. Thus, from November 6, 1998, until November 23, 1998, a period of 17 days, Mrs. Patterson was deprived of custody, or indeed any relationship or contact with her daughter Abby, and vice versa. During that same period of time, Mrs. Patterson believed herself prohibited by Pennsylvania regulation from working at or entering the premises of her several child care centers, while child abuse charges were pending, and so could not go to work or manage the centers in person. (Defendants appear to share, or at least do not challenge, that belief.)

## Plaintiffs' Claims

Based upon the foregoing events, plaintiffs Kelly Patterson, individually and as parent and natural guardian of Abby Ferguson, Douglas Patterson, Kelly's husband, and Kelly's Kids Childcare, Inc., filed a lawsuit against CYS, County and Jo Ellen Bowman. Plaintiffs allege these defendants took Abby into protective custody without reasonable grounds to believe she was an abused child or that she was in imminent risk of serious bodily or physical injury, as they claim is required under the CPSL, and that defendants failed to comply with the procedural requirements of the CPSL by failing to schedule timely hearings and failing to notify Kelly Patterson of the charges against her and to provide her with a meaningful opportunity to respond to said charges. Complaint, ¶ 57. Kelly Patterson alleges she has suffered psychological damage, destruction of the family unit, loss of income, loss of professional reputation in the community, attorneys' fees, costs and other expenses, and disruption of the relationship between her and her ex-husband, Jeffrey Ferguson, regarding custody of Abby Ferguson. Complaint, ¶ 60.

Abby Ferguson alleges she has suffered psychological damage, destruction of the family unit, attorneys' fees, costs and expenses, and disruption of her familial relationships, particularly with her parents. Complaint, ¶ 61. Kelly's Kids Childcare, Inc., alleges it has suffered loss of income, loss of professional reputation in the community as a daycare center, loss of employees, payment of overtime to employees due to Kelly Patterson's inability to be on the premises, loss of present and future clients, and other consequential damages. Complaint, ¶ 62.

At Count One, plaintiffs allege violation of their civil rights under 42 U.S.C. § 1983, which they list as (a) their liberty

and privacy interests in maintaining custody of the minor child without undue inference, including removal from the home without notice and a hearing, (b) the right of familial associations, (c) the right to freedom of intimate association, (d) the right to substantive and procedural due process under the Fourteenth Amendment, (e) the right to be free from excessive force, (f) the right to be free from malicious prosecution, (g) the right to be secure in one's person and property, and (h) the right to freedom of enterprise. Complaint, ¶ 65. Plaintiffs further allege that defendant Bowman acted pursuant to a well-established custom and/or policy of the municipal defendants, the County and CYS, by, *inter alia,* wrongfully utilizing the PFA Act to circumvent rights afforded under the Pennsylvania CPSL, and that the defendants' conduct "shocks the conscience." Complaint, ¶¶ 66–67, 71.

Plaintiffs' remaining counts are "pendent state claims" under this Court's supplemental jurisdiction. Complaint, ¶ 75. Count Two alleges on behalf of the individual plaintiffs against Jo Ellen Bowman, the intentional infliction of emotional distress. Complaint, ¶¶ 76–81. At Count Three, all of the plaintiffs raise a claim of negligence against Ms. Bowman. Complaint, ¶¶ 82–87. In Count Four, all of the plaintiffs raise a claim of civil conspiracy against all of the Armstrong County defendants. Complaint, ¶¶ 88–91. Kelly Patterson brings a claim against Ms. Bowman for malicious prosecution at Count Five. Complaint, ¶¶ 92–97. Finally, Douglas Patterson claims loss of consortium against Jo Ellen Bowman at Count Six. Complaint, ¶¶ 98–99.

The Court granted leave to amend to join additional defendants, and plaintiffs filed an amended complaint joining Township and Officer Yockey. At Count One, all plaintiffs claim violation of civil rights under 42 U.S.C. § 1983 against Township and Officer Yockey. The amended complaint incorporated by reference the allegations of the initial complaint, and claimed the violations of civil rights set forth against the Armstrong County defendants, but with additional deprivations alleged, of (i) the right to counsel, (j) the right against self-incrimination, and (k) the right to freedom of expression. Amended Complaint, ¶ 6. The amended complaint further makes allegations of municipal liability in that Yockey was acting at all relevant times in accordance with well-established custom and/or policies of Township, in a variety of ways including utilizing the Juvenile Act and the PFA Act to circumvent rights afforded by the CPSL. Amended Complaint, ¶ 8.

The remaining pendent state claims against the additional defendants are as follows: at Count One, on behalf of the individual plaintiffs against Yockey, intentional infliction of emotional distress (Amended Complaint, ¶¶ 17–22); at Count Three, all plaintiffs versus Yockey, for negligence (Amended Complaint, ¶¶ 23–28); at Count Four, all plaintiffs versus all defendants, for civil conspiracy (Amended Complaint, ¶¶ 29–32); at Count Five, Kelly Patterson versus Yockey, for malicious prosecution; and Count Six, Douglas Patterson versus Yockey, for loss of consortium.

## Discussion

The primary battle waged in this summary judgment war is over plaintiffs' claims under the Fourteenth Amendment and 42 U.S.C. § 1983 for substantive and, to a much lesser extent, procedural, due process. As set forth above, plaintiffs allege a variety of "rights" deprived them by the actions of the defendants in November 1998. However, with the exception of the right to be free from malicious prosecution, all of the other various rights identi-

fied are either components of the primary right to family integrity, which encompasses the due process claims, or have been abandoned by the plaintiffs because there is no evidence to support the theory. In this latter category are the right to be free from excessive force (there is no indication force was used against any of the plaintiffs), the right against self-incrimination, the right to freedom of expression, and the right to counsel. Accordingly, this Court's analysis of plaintiffs' civil rights claims under section 1983 is confined to their right to familial integrity as protected by substantive and procedural due process under the Fourteenth Amendment, and the right to be free from malicious prosecution.

While there is overlap and interplay between the two types of due process claims in this case, nevertheless these are separate and distinct constitutional principles which require separate and distinct analyses. The parties' respective memoranda overlook the distinction and are devoted almost exclusively to plaintiffs' substantive due process claims, with only superficial treatment of the procedural due process claims and law. Nevertheless, the important facts relevant to the procedural due process claim appear in the record, and enable this Court to make a reasoned decision on this claim.

**Substantive Due Process**

All parties agree that *Croft v. Westmoreland County CYS*, 103 F.3d 1123 (3d Cir. 1997), controls the disposition of the substantive due process claims in this case, although they vigorously contest its application. In *Croft*, the Westmoreland County CYS had received a multiple hearsay report that a young child, still in diapers, was being sexually abused by the father. A CYS caseworker, accompanied by a state trooper, went to the plaintiffs' home that evening, interviewed the parents, and based on rampant speculation about per-

ceived inconsistencies in the parents' response to the allegation of sexual abuse, the CYS caseworker gave the father an ultimatum: "Unless he left his home and separated himself from his daughter until the investigation was complete, [the CYS caseworker] would take [the daughter] physically from the home that night and place her in foster care." 103 F.3d at 1124. At the conclusion of this interview, the CYS caseworker was "uncertain whether any sexual abuse had occurred," but since she could not rule it out, and the parents had not proved beyond any certainty there was no sexual abuse, she determined she needed to remove the child or the source of the alleged abuse from the home. The parents were compelled to acquiesce to the ultimatum.

The district court entered summary judgment against the parents on their complaint raising impermissible interference with their Fourteenth Amendment liberty interest in the continued companionship of their daughter. The Court of Appeals for the Third Circuit reversed, stating:

> We recognize the *constitutionally protected liberty interests that parents have in the custody, care and management of their children* .... We also recognize that *this interest is not absolute* .... Indeed, this liberty interest in familial integrity is *limited by the compelling governmental interests in the protection of children*—particularly where the children need to be protected from their own parents.... The right to familial integrity, in other words, does not include a right to remain free from child abuse investigations....
>
> The *Due Process Clause of the Fourteenth Amendment prohibits the government from interfering in familial relationships unless the government adheres to the requirements of procedural*

*and substantive due process* .... In determining whether the Crofts' constitutionally protected interests were violated, we must balance the fundamental liberty interests of the family unit with the compelling interests of the state in protecting children from abuse. Whatever disruption or disintegration of family life the Croft's may have suffered as a result of the County's child abuse investigation does not, in and of itself, constitute a constitutional deprivation. ...

*Croft,* 103 F.3d at 1125–26 (citations and footnote omitted; emphasis added).

The Court noted that there are cases in which a child protective agency is justified in removing either a child or the parent from the home, "even where later investigation proves no abuse occurred." *Id.* at 1126. However, *Croft* was not one of those cases, and the "state has no interest in protecting children from their parents *unless it has some reasonable and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse.*" *Id.* (emphasis added). The Court focused on "whether the information available to the defendants at the time would have created an *objectively reasonable suspicion of abuse justifying the degree of inference with the parents' rights as the child's parents.*" *Id.* In the absence of such reasonable grounds, the governmental intrusions of this nature "are arbitrary abuses of power." *Id.* (emphasis added).

The Court held that the CYS caseworker, acting on an anonymous tip with multiple layers of hearsay, without any corroborating evidence, and without any evidence that convinced her one way or another that there was any sexual abuse involved, had insufficient justification for such a drastic infringement on parental and children's rights (familial integrity), and so was an arbitrary abuse of government power. *Id.* at 1127. Under all of the circumstances, the Court held the CYS caseworker "lacked objectively reasonable grounds to believe the child has been sexually abused or was in imminent danger of sexual abuse." *Id.* Accordingly, the district court's grant of summary judgment in defendant's favor was reversed and the case was remanded. Substantive due process was the only issue before the court, but it noted the policy of removing the suspected parent from the family home while the child abuse investigations were pending, absent any procedural safeguards, raised procedural due process concerns which it had no occasion to address or resolve. *Id.* at 1125, n. 3.

*Croft* was explained and followed in *Miller v. City of Philadelphia,* 174 F.3d 368 (3d Cir.1999). *Miller* involved claims for the deprivation of substantive and procedural due process by a mother and her three children, *inter alia,* against the City of Philadelphia and its Department of Human Services ("DHS"), for removing the children from the family home without probable cause and, in fact, based upon false information provided to the emergency judge who ordered the children removed temporarily. After the DHS investigation was pursued sporadically, it eventually was closed by the agency without further judicial proceedings.

Citing *Croft* and *Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), *Miller* recognized the fundamental liberty interests by parents in the care, custody and management of their children, an interest which must be balanced against the State's interest in protecting children suspected of being abused. 174 F.3d at 373, 374. The Court held that where abusive government action by a member of the executive branch is alleged, "only the most egregious official conduct

can be said to be arbitrary in the constitutional sense." *Id.* at 375, *quoting County of Sacramento v. Lewis,* 523 U.S. 833, 846, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). Under this standard, executive action will not expose the official to liability unless it is "so ill-conceived or malicious that it 'shocks the conscience.'" *Id.* The Court emphasized that *Croft* was simply an application of the traditional substantive due process "shocks the conscience" standard. *Miller,* 174 F.3d at 376.

Importantly, the Court also noted that deliberate indifference that shocks the conscience in one context may not seem or be so egregious in another context, making the nature and particulars of each case critical. *Id.* at 375. The Court stated:

> We recognize that a social worker acting to separate parent and child does not usually act in the hyperpressurized environment of a prison riot or a high-speed chase. However, he or she rarely will have the luxury of proceeding in a deliberate fashion, as prison medical officials can. As a result, in order for liability to attach, a social worker need not have acted with the "purpose to cause harm," but *the standard of culpability for substantive due process purposes must exceed both negligence and deliberate indifference, and reach a level of gross negligence or arbitrariness that indeed "shocks the conscience."*

*Id.* at 375–76 (emphasis added).

Although the Court discussed and identified facts which indicated defendants' investigation was shoddy and less professional than it should have been,[2] the Court concluded that, "Even if all of the facts alleged above [*see* note 2] were true, [the DHS investigator] did not act in a way that shocks the conscience." 174 F.3d at 377. *See also Robert S. v. City of Philadelphia,* 2000 WL 341565, *4 (E.D.Pa. 2000) ("*Lewis* and *Miller* now require applying the 'shock the conscience' standard to all substantive due process claims under Section 1983.... It is a flexible standard depending on the facts of each case." Citations omitted); *Doman v. City of Philadelphia,* 2000 WL 1224906, *2 (E.D.Pa. 2000) ("The Third Circuit has made it clear that when it comes to a social worker's interference with the parent-child relationship, only conduct that is so arbitrary as to shock the conscience may be considered violative of a parent's substantive due process rights. *Miller* ....")

 This case does not rise to the level of questionable, but not conscience shocking, conduct displayed in *Miller,* and it certainly does not rise to the level of arbitrariness seen in *Croft,* which *did* shock the conscience. Plaintiffs do not dispute that Kelly Patterson and her daughter Abby were involved in a physical altercation, a wrestling match, on the morning of November 6, 1998, and that Kelly Patterson pulled Abby by her hair from the car, wrestled her to the ground and pushed her face in the gravel driveway, causing minor

---

**2.** Specifically, the Court noted that the investigator had asked the children leading questions when he first visited their daycare center, he requested that the mother produce all three children for examination at the hospital even though there were grounds to suspect only one of the children might have been abused, he met secretly with the hospital social worker and excluded the mother's attorney from the area outside the examination room, he was advised by a doctor that it was not clear whether the child's bruises were accidental or a result of physical abuse, and the investigator had received reviews in his personnel file indicating he had problems with his coworkers and did not always stick to the proper procedures. These facts did not prevent the Court from concluding that the investigator's actions did *not* shock the conscience and so did *not* violate plaintiffs' substantive due process rights.

bruises, cuts and scrapes, and that when she got to school, Abby was red faced, crying, and visibly upset. Importantly, plaintiffs also agree the school officials were, in Kelly Patterson's own words, "absolutely" required to report the incident to the appropriate CYS agency under the CPSL.

Similarly, plaintiffs do not dispute that Abby Ferguson unequivocally told several school officials, Officer Yockey and Ms. Bowman that she was afraid and did not want to go home, and that she knew her mother would be angry with her because CYS was now involved. All of the school officials and employees, as well as Officer Yockey and Ms. Bowman, were concerned on the afternoon of November 6, 1998, for Abby Ferguson's safety and well being, and determined that they were not able to ensure her safety if she returned to the family residence.

Under all of the circumstances, and comparing them with the facts and circumstances of *Croft* and *Miller*, defendants clearly, and as a matter of law, had reasonable and articulable evidence before them giving rise to a reasonable suspicion that Abby Ferguson had been abused or was in imminent danger of abuse. Their conduct did not approach the level of arbitrary government action of the case worker in *Croft*, and a reasonable jury could not conclude, on the undisputed historical facts, that their conduct "shocks the conscience."

Plaintiffs argue that it was not objectively reasonable for defendants to believe, on the afternoon of November 6, 1998, that Abby Ferguson had been abused or was in danger of being abused, for several reasons.

1. *Retaliation.* Plaintiffs vigorously contend that defendants' actions, particularly Ms. Bowman's, were in retaliation for Mrs. Patterson having the temerity to refuse to give them a statement until after she had spoken with her attorney. They claim this was an interference with Mrs. Patterson's right to counsel. It is not apparent how a constitutional "right to counsel" arises in this civil proceeding, and plaintiffs have not attempted to show how it might. Even if it is true that Bowman was peeved about Mrs. Patterson's request to speak with an attorney, however, such "retaliation" would not "shock the conscience." In *Miller,* the Court of Appeals rejected the argument that the due process clause required the government to allow the parent or her attorney to take part in an emergency hearing at the hospital, even though both were present. 174 F.3d at 372–73. In any event, as a factual matter the record does not bear out plaintiffs' contention.

This situation had been percolating all day, from the morning until around 2:45 p.m. when Kelly Patterson came to school to get Abby, and became aware of CYS and police involvement. Ms. Bowman did not want to go in person to Mrs. Patterson's child care center, and attempted to contact Mrs. Patterson earlier by telephone, but she inexplicably did not receive the messages. Mrs. Patterson does not dispute that when she was attempting to contact her attorney, she told Ms. Bowman that she had no idea when her attorney would arrive, and that it could be 30 minutes or "it could take six hours." (She says she did not have an "attitude" and defendants claim she did, but that is not material.) At that point, Ms. Bowman and Officer Yockey made the decision to take Abby into protective custody.

Although Mrs. Patterson's attorney arrived at the school only about 30 minutes after he received the phone call, at around 4:00 p.m., by that time defendants' decision had been made. Their refusal to listen to Mrs. Patterson's statement, *at that time,*

does not shock this Court's conscience. *See Miller,* 174 F.3d at 372–73. While another CYS caseworker or police officer might have been inclined to listen to her statement at that point, and while, perhaps, it might have been *preferable* for them to have done so, failure to do so does not qualify as an arbitrary governmental abuse of power.

2. *No Opportunity to Explain.* Closely related to the retaliation argument, plaintiffs argue their substantive due process rights were violated by defendants' refusal to listen to Mrs. Patterson's explanation for the day's events before they took Abby Ferguson into protective custody. As noted, there was no constitutional requirement that defendants listen to Mrs. Patterson's explanation at that time. *Miller,* 174 F.3d at 372–73. Moreover, Kelly Patterson's explanation, painstakingly detailed in her deposition testimony, is *not significantly different* from Abby's seven-page handwritten statement or from her oral statements to school officials, Ms. Bowman and Officer Yockey. Instead, Kelly Patterson's version of the events of November 6th, which presumably would have been the version she told officials on November 6th had she been permitted to make a statement, attempts to put the wrestling match in context. That context, the escalating disagreement that had been brewing for over a week about Abby wanting to live with her father, would show Mrs. Patterson in a more sympathetic light, not as a mean or abusive parent but as a frustrated mother who had reached her wits end with a rebellious teenager, ending up in a hair-pulling, wrestling match in the driveway of their home when all else had failed.

But this context was evident from Abby's own handwritten statement, and does not contradict the historical facts known to defendants at that time, nor would it have changed defendants' concern that they could not ensure Abby's safety if she were permitted to return to the home, while emotions continued to run high.

3. *The Fear Factor.* Plaintiffs also contend that Abby Ferguson told defendants at the school that she was not a victim of child abuse, and that, even though she said she was afraid, she never told them that she was afraid that her mother would hit her, and that defendants should have conducted additional investigation or probed into the psychological foundation of Abby's fear. This argument is somewhat misleading, and rests on a distinction without a difference.

Abby told *everyone* at school that day she was afraid to go home. She told *everyone* she was in a physical fight with her mother, and they saw her bruises, scrapes and cuts. Abby told school officials and defendants she knew her mother would be angry, and particularly that she would be angry that CYS was involved. She also said she was afraid that the situation would escalate if she were to go home with her mother. School officials and defendants were not required to probe more deeply into the psychological basis of Abby Ferguson's fear. Whether she was afraid that her mother would hit her (and there is no evidence of that) or afraid to go home because the situation was out of control and her mother would be angry (and there was plenty of evidence of that), the fact remains that there was reasonable suspicion of abuse or imminent danger of abuse, and defendants could not ensure Abby's safety if they were to allow her to return home with Mrs. Patterson.

4. *Minor Nature of Injuries.* Everyone agrees that the CPSL requires "serious physical or mental injury" not explained by accident to sustain a finding of child abuse on the grounds of bodily injury. 23 Pa.C.S. § 6303. Because Abby's

injuries were obviously not serious, it was unreasonable for defendants to conclude she had been abused.

Defendants did not, however, determine on November 6th that Abby had been abused within the meaning of the CPSL, rather, they determined there was a reasonable suspicion Abby had been abused or was in imminent danger of being abused if she were to be allowed to return home. Whether or not she was *in fact* abused within the meaning of the CPSL (i.e., had sustained serious physical or mental injury) was a determination on the merits for another day. As it turned out, after CYS received Abby's medical reports from Grove City Hospital, it confirmed her injuries were not serious, and on November 23, 1998, declared the investigation "unfounded."[3] On November 6, 1998, defendants were not required to know or guess at the full extent of Abby Ferguson's injuries. All that the constitution required of them was that they have reasonable and articulable evidence giving rise to reasonable suspicion that she had been abused or was in imminent danger of abuse. *See Brown v. Town of East Haddam*, 56 F.Supp.2d 212 (D.Conn.1999), *aff'd* 213 F.3d 625, 2000 WL 536156 (2000) (School officials had reasonable suspicion to suspect child abuse or danger of child abuse when daughter arrived at school with a bruise under her left eye after mother had given her a backhand during an argument on the ride into school, and where the daughter told officials that mother had been abusive for some time and that she no longer wanted to live in the marital home).

Accordingly, the Court finds that the individual defendants are entitled to summary judgment on plaintiffs' claims of a deprivation of their rights to substantive due process under the Fourteenth Amendment and 42 U.S.C. § 1983.

Because there is no constitutional deprivation of substantive due process rights, the municipalities are also entitled to summary judgment on this claim. Plaintiffs state substantive due process claims under the Fourteenth Amendment against the County, CYS and the Township which are not *necessarily* foreclosed by the holding that the individual defendants are not liable. *See, e.g., Estate of Burke v. Mahoney City*, 40 F.Supp.2d 274 (E.D.Pa.1999), *following Fagan v. City of Vineland*, 22 F.3d 1283 (*en banc*), *aff'd in part*, 22 F.3d 1296 (3d Cir.1994) (substantive due process claims against municipality may survive even though underlying fourth amendment claims against officer were dismissed).

In *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 689, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the United States Supreme Court held that although municipalities and other local governmental bodies are "persons" within the meaning of section 1983, a municipality may not be held vicariously liable under section 1983 solely because of the existence of an employer-employee relationship with a tortfeasor. Instead,

> in *Monell* and subsequent cases, we have required a plaintiff seeking to impose liability on a municipality under § 1983 to identify a municipal "policy" or "custom" that caused the plaintiff's injury..... Locating a "policy" ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the munici-

---

**3.** There is no explanation on the record why it took 17 days for CYS to obtain a copy of the medical report which apparently was completed the weekend of November 6, 1998. The medical report has not been included in the summary judgment materials.

pality. *Monell, supra,* at 694, 98 S.Ct., at 2027. Similarly, an act performed pursuant to a "custom" that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law....

\* \* \* \* \* \*

As our § 1983 municipal liability jurisprudence illustrates, however, it is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the "moving force" behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.

*Board of County Comm'rs of Bryan County, Oklahoma v. Brown,* 520 U.S. 397, 403–04, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) (additional citations omitted).

The Court of Appeals for the Third Circuit has explained, in *Beck v. City of Pittsburgh,* 89 F.3d 966, 971–72 (3d Cir.1996):

When a suit against a municipality is based on § 1983, the municipality can only be liable when the alleged constitutional transgression implements or executes a policy, regulation or decision officially adopted by the governing body or informally adopted by custom. *Monell* ... Thus, although the municipality may not be held liable for a constitutional tort under § 1983 on the theory of vicarious liability, it can be held responsible as an entity when the injury inflicted is permitted under its adopted policy or custom....

The Court's holding and reasoning in *Monell* have created a two-path track to municipal liability under § 1983, depending on whether the allegation is based on municipal policy or custom..... In *Andrews* [*v. City of Philadelphia,* 895 F.2d 1469 (3d Cir.1990) ] this court articulated the distinctions between these two sources of liability:

A government policy or custom can be established in two ways. Policy is made when a "decisionmaker possess[ing] final authority to establish municipal policy with respect to the action" issues an official proclamation, policy, or edict. A course of conduct is considered to be a "custom" when, though not authorized by law, "such practices of state officials [are] so permanent and well-settled" as to virtually constitute law.

895 F.2d at 1480 (citations omitted); *see also Bielevicz v. Dubinon,* 915 F.2d 845, 850 (3d Cir.1990) (same). Custom, on which the plaintiff relies in this case, may also be established by evidence of knowledge and acquiescence. *See Fletcher v. O'Donnell,* 867 F.2d 791, 793 (3d Cir.1989), *cert. denied,* 492 U.S. 919, 109 S.Ct. 3244, 106 L.Ed.2d 591 (1989).

Moreover, a plaintiff must show not only an unlawful policy or custom of the municipality, he or she must also establish that such policy or custom was the proximate cause of the injuries sustained, by showing a plausible nexus or affirmative link between the alleged policy or custom and the injuries. *Kneipp v. Tedder,* 95 F.3d 1199, 1213 (3d Cir.1996).

Plaintiffs have made little effort to shoulder their burden of proving the existence of a municipal policy or custom, lawful or unlawful, that deprived them of substantive due process, nor do they discuss, much less attempt to show by record evidence, any casual connection between some vaguely identified custom and the

damages claimed. Accordingly, the Court must also grant summary judgment for the municipal entities. *See, e.g., Heron v. City of Philadelphia,* 987 F.Supp. 400, 404 (E.D.Pa.1997).

**Qualified Immunity—Substantive Due Process**

All defendants raise qualified immunity as a defense to plaintiffs' civil rights claims. The required approach to qualified immunity is to examine the record to determine whether plaintiffs have supported a constitutional violation before proceeding to determine if qualified immunity will insulate defendants' conduct from further judicial scrutiny. *Sterling v. Borough of Minersville,* 232 F.3d 190, 193 (3d Cir.2000); *Miller,* 174 F.3d at 374, *citing Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991) and *Larsen v. Senate of the Commonwealth of Pennsylvania,* 154 F.3d 82, 86 (3d Cir. 1998) ("[W]hen a qualified immunity defense is raised a court first should determine whether the plaintiff has asserted a violation of a constitutional right at all."). This Court's determination on the merits of plaintiffs' substantive due process claim renders discussion of qualified immunity in that context unnecessary. Nevertheless, the Court deems it appropriate to address the issue of qualified immunity in the alternative, assuming *arguendo* that defendants' conduct might be viewed as supporting a claim for a substantive due process violation.

In *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the United States Supreme Court held "that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." This doctrine of official or quali-

fied immunity recognizes "the need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." *Id.* at 807, 102 S.Ct. 2727 (internal quotations and citation omitted). Recently, the Court of Appeals for the Third Circuit set out the proper analysis of the defense of qualified immunity:

> In determining whether the individual CYS officials are entitled to claim qualified immunity, we engage in a three-part inquiry: (1) whether the plaintiffs alleged a violation of their statutory or constitutional rights; (2) whether the right alleged to have been violated was clearly established in the existing law at the time of the violation; and (3) whether a reasonable official should have known that the alleged action violated the plaintiffs' rights. *Rouse v. Plantier,* 182 F.3d 192, 196–97 (3d Cir.1999).... The second and third parts are related, and involve an inquiry into the "objective legal reasonableness" of an official's action, assessed in light of legal rules that were "clearly established" at the time the officials took the action. *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (internal quotations and citation omitted). *Rights may be clearly established even though the precise conduct at issue has not yet been declared unlawful. See id.* at 640, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523. Throughout the inquiry, the officials' subjective intent is irrelevant. *See id.* at 639, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523.

> The Supreme Court has directed that the right in question should be defined in a particularized and relevant manner, rather than abstractly. *See id.* at 640, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523.

*Doe v. County of Centre, Pennsylvania,* 242 F.3d 437, 453–54 (3d Cir.2001) (emphasis added).

In *Good v. Dauphin County Social Services for Children and Youth,* 891 F.2d 1087 (3d Cir.1989), a mother suspected of child abuse brought a civil rights action against the municipal and county officials who conducted an allegedly improper and intrusive search at her home. The Court of Appeals for the Third Circuit held that the social services caseworker and police officer who assisted him were not entitled to qualified immunity because the law was clearly established, at the time of the search, that they could not conduct an intrusive physical examination of a child in the absence of a parent's consent or an objectively reasonable belief that the child was in imminent danger of serious bodily injury and that the intrusions were necessary to prevent that harm. The Court of Appeal's analysis in *Good* examined the Supreme Court's opinion in *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), which smoothed out a few wrinkles in the highly nuanced doctrine of qualified immunity:

> The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of preexisting law the unlawfulness must be apparent.

[*Anderson,* 483 U.S. at 639–40, 107 S.Ct. 3034] (citation omitted).

The *Anderson* Court further pointed out that the "reasonable official" test includes a factual as well as a legal component:

> It follows from what we have said that the determination whether it was ob-
> jectively legally reasonable to conclude that a given search was supported by probable cause or exigent circumstances will often require examination of the information possessed by the searching officials.... The relevant question in this case, for example, is the objective (albeit fact-specific) question whether a reasonable officer could have believed Anderson's warrantless search to be lawful, in light of clearly established law and the information the searching officers possessed. Anderson's subjective beliefs about the search are irrelevant.

*Id.* at 641, 107 S.Ct. at 3034.

As we read *Anderson,* it teaches two lessons that are important in resolving the case before us. *First, in order for the governing law to be sufficiently well established for immunity to be denied, it is not necessary that there have been a previous precedent directly in point. " '[S]ome but not precise factual correspondence' to precedent" is necessary for the defendant to be charged with knowledge of the unlawfulness of his or her actions.* Stoneking v. Bradford Area School District, 882 F.2d 720, 726 (3d Cir.1989) (*quoting People of Three Mile Island v. Nuclear Regulatory Comm.,* 747 F.2d 139, 144 (3d Cir.1984)). *The ultimate issue is whether, despite the absence of a case applying established principles to the same facts, reasonable officials in the defendants' position at the relevant time could have believed, in light of what was in the decided case law, that their conduct would be lawful. Second,* even where the officials clearly should have been aware of the governing legal principles, *they are nevertheless entitled to immunity if based on the information available to them they could have believed*

*their conduct would be consistent with those principles.* With these teachings in mind we turn to the state of the law at the relevant time, and then to the information available to the defendants in this case.

*Good,* 891 F.2d at 1092 (emphasis added).

■ The relevant law was clearly established by *Croft* no later than January, 1997, that government officials could not take a child into temporary protective custody unless they had reasonable and articulable evidence giving rise to a *reasonable suspicion* that she had been abused or was in imminent danger of abuse. Based upon the facts and circumstances *known to defendants on November 6th,* as set forth above, including bruises, scrapes and cuts from a physical altercation with Mrs. Patterson, and a very upset child who *consistently* and *repeatedly* told officials she was afraid the situation might escalate if she went home and she did not want to go home, it was objectively reasonable for them to *suspect* that Abby may have been abused or that she was in imminent danger of being abused if she were permitted to go home with her mother. While subsequent medical examination disclosed no broken bones or serious injuries, which therefore dictated a finding of no physical abuse and an "unfounded" determination closing the investigation, defendants were not required to allow Abby to return home on November 6th when they did not know the full extent of her injuries and when they reasonably believed they were unable to ensure her safety at home.

If defendants erred, they erred on the side of Abby's safety and welfare. The doctrine of qualified immunity insulates officials who reasonably exercise their discretion in such circumstances, affording them the benefit of the doubt when they *reasonably* make difficult judgment calls. Assuming there was error, therefore, the individual defendants are nevertheless entitled to qualified immunity on plaintiffs' claims under 42 U.S.C. § 1983 for violation of their Fourteenth Amendment substantive due process rights. *E.g., Hollingsworth v. Hill,* 110 F.3d 733 (10th Cir.1997); *Baker v. Racansky,* 887 F.2d 183 (9th Cir. 1989).

Furthermore, the individual defendants solicited advice of counsel, and no less than the District Attorney advised them to take Abby into protective custody on November 6, 1998, and for Officer Yockey to file criminal charges. Defendants' reliance on this advice, reasonable on its face, offers additional justification for these defendants' actions, and for qualified immunity. *Hollingsworth,* 110 F.3d at 740–42.

**Procedural Due Process**

While defendants did not violate plaintiffs' rights to *substantive* due process, the Court finds they did violate plaintiffs' Fourteenth Amendment rights to *procedural* due process. The *extent* of that procedural due process violation is not clear, however. Determination of that issue will have a direct impact on plaintiffs' damages, and will require development at trial and a factual determination by the jury.

Although not developed in the respective memoranda of law, the procedural due process analysis is distinct from the substantive due process analysis. As discussed above, there is no question that the fundamental expectations of a parent in the care, custody and management of her child is a well-recognized liberty interest, entitled to the protections of the due process clause. *Croft,* 103 F.3d at 1125. Indeed, it is "perhaps the oldest of the fundamental liberty interests recognized" by the United States Supreme Court. *Gruenke v. Seip,* 225 F.3d 290, 304 (3d Cir.2000), *quoting Troxel v. Granville,* 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49

(2000). The question then becomes, what process is due?

"Once it is determined that due process applies, the question remains what process is due." ... We turn to that question, fully realizing as our cases regularly do that the interpretation and application of the Due Process Clause are intensely practical matters and that "(t)he very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." ...

\* \* \* \* \* \*

There are certain bench marks to guide us, however, *Mullane v. Central Hanover Trust Co.,* 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950), a case often invoked by later opinions, said that "(m)any controversies have raged about the cryptic and abstract words of the Due Process Clause but there can be no doubt that *at a minimum they require that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case." Id.,* at 313, 70 S.Ct. 652. "The fundamental requisite of due process of law is the opportunity to be heard," ..., a right that "has little reality or worth unless one is informed that the matter is pending and can choose for himself whether to ... contest." .... At the very minimum, therefore, students facing suspension and the consequent interference with a protected property interest must be given some kind of notice and afforded some kind of hearing. "Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified." *Baldwin v. Hale,* 1 Wall. 223, 233, 17 L.Ed. 531 (1863).

It also appears from our cases that the timing and content of the notice and the nature of the hearing will depend on appropriate accommodation of the competing interests involved.

*Goss v. Lopez,* 419 U.S. 565, 577–79, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975) (ten day suspension of high school student without notice or hearing and opportunity to be heard prior to suspension violated right to procedural due process; parallel and some other citations omitted; emphasis added).

The frequently cited test for whether process afforded was constitutionally adequate was formulated in *Mathews v. Eldridge,* 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), which states:

[O]ur prior decisions indicate that identification of the specific dictates of due process generally requires consideration of *three distinct factors: First,* the *private interest* that will be affected by the official action; *second,* the *risk of an erroneous deprivation of such interest* through the procedures used, *and* the *probable value, if any, of additional or substitute procedural safeguards;* and *finally, the Government's interest,* including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews,* 424 U.S. at 334–35, 96 S.Ct. 893 (citations omitted; emphasis added), applied in *Miller,* 174 F.3d at 373.

There is a *strong constitutional preference for pre-deprivation hearings, preceded* by meaningful notice and meaningful opportunity to be heard. *Goss,* 419 U.S. at 579–81, 95 S.Ct. 729; *see also Zinermon v. Burch,* 494 U.S. 113, 127, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990) (collecting cases). However, given the flexible nature of the due process inquiry and the myriad of situations in which the inquiry arises, "courts have found that even though parents have a fundamental liberty interest in the custody of their children they do not

always have a right to prior process when the state removes their children from their custody. Courts agree that 'in emergency circumstances which pose an immediate threat to the safety of a child, officials may temporarily deprive a parent of custody without parental consent or a court order.' " *Egervary v. Rooney*, 80 F.Supp.2d 491, 501 (E.D.Pa.2000), *quoting Hollingsworth v. Hill*, 110 F.3d 733, 739 (10th Cir.1997) (numerous additional citations omitted).

But when the circumstances justify an emergency, expedient deprivation without prior hearing, the state is obligated to provide a prompt, post-deprivation hearing in a meaningful time and manner. "In such cases, the necessary notice and ... hearing should follow *as soon as practicable....*" *Goss*, 419 U.S. at 582–83, 95 S.Ct. 729. There is a point at which an unjustified delay in providing or completing a post-deprivation proceeding becomes an unconstitutional due process violation. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 547, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). The United States Supreme Court held that "the significance of such a delay cannot be evaluated in a vacuum," *Federal Deposit Ins. Corp. v. Mallen*, 486 U.S. 230, 242, 108 S.Ct. 1780, 100 L.Ed.2d 265 (1988), and must take into account several factors:

> In determining how long a delay is justified in affording a post-suspension hearing and decision, it is appropriate to examine the importance of the private interest and the harm to this interest occasioned by delay; the justification offered by the Government for delay and its relation to the underlying governmental interest; and the likelihood that the interim decision may have been mistaken.

*Mallen*, 486 U.S. at 241, 108 S.Ct. 1780.

■ Thus, as the District Court for the Eastern District of Pennsylvania has said, even "when an imminent threat of harm justifies removing a child from their parent's custody without prior process, there must be a *prompt, state initiated post-deprivation hearing* to ratify the removal." *Egervary*, 80 F.Supp.2d at 502 (collecting cases). That generally requires that *the state initiate* the post deprivation proceedings in a matter of *hours or days, not weeks. Id.*, 80 F.Supp.2d at 502–03 (collecting cases).

## What Process Is Provided by State Law?

Before determining whether the postdeprivation process, if any, was adequate in this case, there are three Pennsylvania statutes relevant to the child protective custody context, that must be read *in pari materia:* the CPSL, the Juvenile Act, and the PFA Act.

## The Child Protective Services Law, Chapter 63, 23 Pa.C.S. §§ 6301–6384

The CPSL was enacted based on the Pennsylvania legislature's finding that abused children are in need of an effective child protective service to prevent them from suffering additional injury and impairment. 23 Pa.C.S. § 6302(a). The expressed legislative purpose of the CPSL is:

> [T]o encourage more complete reporting of suspected child abuse; to the extent permitted by this chapter, to involve law enforcement agencies in responding to child abuse; and to establish in each county protective services for the purpose of investigating the reports swiftly and competently, providing protection for children from further abuse and providing rehabilitative services for children and parents involved so as to ensure the child's well-being and to preserve, stabilize and protect the integrity of family life wherever appropriate or to provide another alternative permanent family when the unity of the family cannot be

maintained. It is also the purpose of this chapter to ensure that each county children and youth agency establish a program of protective services with procedures to assess risk of harm to a child and with the capabilities to respond adequately to meet the needs of the family and child who may be at risk and to prioritize the response and services to children most at risk.

23 Pa.C.S. § 6302(b).

To accomplish these goals, the CPSL sets up a comprehensive and mandatory system of reporting of suspected child abuse, with protection for mandatory reporters, and creates local child protective services agencies, like the Armstrong County CYS. Subchapter B and D. The CPSL also provides for taking a child into protective custody, in part as follows:

(a) General rule.—A child may be taken into protective custody:

(1) *As provided by 42 Pa.C.S. § 6324 (relating to taking into custody).*

\* \* \* \* \* \*

(b) Duration of custody.—*No child may be held in protective custody for more than 24 hours unless the appropriate county agency is immediately notified that the child has been taken into custody and the county agency obtains an order from a court of competent jurisdiction permitting the child to be held in custody for a longer period. Each court shall insure that a judge is available 24 hours a day, 365 days a year to accept and decide the actions brought by a county agency under this subsection within the 24–hour period.*

(c) Notice of custody.—An individual taking a child into protective custody under this chapter shall immediately, and within 24 hours in writing, notify the parent, guardian or other custodian of the child of the whereabouts of the child, unless prohibited by court order, and the reasons for the need to take the child into protective custody . . . .

(d) Informal hearing.—*In no case shall protective custody under this chapter be maintained longer than 72 hours without an informal hearing under 42 Pa.C.S. § 6332 (relating to informal hearing) . . . .*

\* \* \* \* \* \*

(f) Conference with parent or other custodian.—*A conference between the parent, guardian or other custodian of the child taken into temporary protective custody pursuant to this section and the employee designated by the county agency to be responsible for the child shall be held within 48 hours of the time that the child is taken into custody . . . .*

23 Pa.C.S. § 6315(a)—(f) (emphasis added).

## The Juvenile Act, 42 Pa.C.S. §§ 6301–6365

The Juvenile Act is concerned not only with children who might be abused or neglected but also with delinquent children, and its stated purposes are:

(1) To preserve the unity of the family whenever possible or to provide another alternative permanent family when the unity of the family cannot be maintained.

(1.1) To provide for the care, protection, safety and wholesome mental and physical development of children coming within the provisions of this chapter.

(2) Consistent with the protection of the public interest, to provide for children committing delinquent acts programs of supervision, care and rehabilitation . . . .

(3) To achieve the foregoing purposes in a family environment whenever possible, *separating the child from parents*

*only when necessary for his welfare, safety or health* or in the interests of public safety.

(4) *To provide means through which the provisions of this chapter are executed and enforced and in which the parties are assured a fair hearing and their constitutional and other legal rights recognized and enforced.*

42 Pa.C.S. § 6301(b), Purposes.

Section 6324 of the Juvenile Act, 42 Pa.C.S. § 6324, referenced in section 6315(a)(1) of the CPSL, in turn provides that a child may be taken into custody only:

(1) Pursuant to an order of the court under this chapter.

(2) Pursuant to the laws of arrest.

(3) *By a law enforcement officer or duly authorized officer of the court if there are reasonable grounds to believe that the child is suffering from illness or injury or is in imminent danger from his surroundings, and that his removal is necessary.*

(4) By a law enforcement officer or duly authorized officer of the court if there are reasonable grounds to believe that the child has run away . . . .

(5) By a law enforcement officer or duly authorized officer of the court if there are reasonable grounds to believe that the child has violated conditions of his probation.

Section 6325 of the Juvenile Act provides that a child taken into custody "shall not be detained or placed in shelter care prior to the hearing on the petition unless his detention or care is required to protect the person or property of others or of the child . . ." 42 Pa.C.S. § 6325. Also cross-referenced in the CPSL are the procedural hearing requirements of the Juvenile Act in Subchapter C, 42 Pa.C.S. §§ 6331–6342. Section 6331 provides, *inter alia*, that if a child brought before a court is not immediately released, "a petition shall be promptly made and presented to the court within 24 hours or the next court business day . . ." 42 Pa.C.S. § 6331. Section 6332, Informal hearing, provides:

(a) General rule.—An informal hearing shall be held promptly by the court or master and not later than 72 hours after the child is placed in detention or shelter care to determine whether his detention or shelter care is required under section 6325 (relating to detention of child) . . . Reasonable notice thereof . . . shall be given to the child and if they can be found, to his parents, guardian, or other custodian. Prior to the commencement of the hearing the court or master shall inform the parties of their right to counsel and to appointed counsel if they are needy . . .

42 Pa.C.S. § 6332.

Once a petition has been filed alleging the child to be delinquent or dependent, the "court shall fix the time" for a formal hearing no later than ten days from the filing of the petition; if the hearing is not held, the child is to be released from detention or shelter care, but the court may extend the period for an additional ten days if the court determines at a hearing that there are reasonable grounds to believe, by clear and convincing evidence, that, *inter alia*, the child's life is in danger. 42 Pa.C.S. § 6335(a).

**The Protection From Abuse Act, Chapter 61, 23 Pa.C.S. §§ 6101–6118**

Preceding the CPSL at Chapter 63 of the Domestic Relations Code is Chapter 61, Protection from Abuse. Both the CPSL and the Juvenile Act appear in Part IV of the Code, Abuse of Family. The PFA Act provides that an "adult or an emancipated minor may seek relief under this chapter for that person or any parent . . . may seek relief . . . on behalf of minor

children ... by filing a petition with the court alleging abuse by the defendant." 23 Pa.C.S. § 6106(a). The usual procedure is as follows:

> (a) General rule.—*Within ten days* of the filing of a petition under this chapter, *a hearing shall be held before the court,* at which the plaintiff must prove the allegation of abuse by a preponderance of the evidence. The court shall, at the time the defendant is given notice of the hearing, advise the defendant of the right to be represented by counsel, and of the fact that any protection order granted by a court may be considered in any subsequent proceedings under this title. This notice shall be printed and delivered in a manner which easily attracts attention to its content and shall specify that child custody is one of the proceedings where prior protection orders may be considered.

> (b) Temporary orders.—*If a plaintiff petitions for temporary order for protection from abuse and alleges immediate and present danger of abuse to the plaintiff or minor children, the court shall conduct an ex parte proceeding. The court may enter such a temporary order as it deems necessary to protect the plaintiff or minor children when it finds they are in immediate and present danger of abuse. The order shall remain in effect until modified or terminated by the court after notice and hearing* ....

23 Pa.C.S. § 6107.

The "court" has authority to grant a wide range of relief, including awarding temporary custody, 23 Pa.C.S. § 6108(a)(4). However, the PFA Act also provides for emergency relief by "hearing officers," which includes members of the minor judiciary. When a judge of a court is *unavailable* (as defined in subsection (a), including from the end of the business week to the beginning of the next business week),

> a petition may be filed *before a hearing officer* who may grant relief in accordance with section 6108(a)(1), (2) and (6) or (1) and (6) (relating to relief) *if the hearing officer deems it necessary to protect the plaintiff or minor children from abuse upon good cause shown in an ex parte proceeding. Immediate and present danger of abuse to the plaintiff or minor children shall constitute good cause* for the purposes of this subsection.

> (b) *Expiration of order.*—An order issued under subsection (a) *shall expire at the end of the next business day the court deems itself available. The court shall schedule hearings on protection orders entered by hearing officers under subsection (a) and shall review and continue in effect protection orders that are necessary to protect the plaintiff or minor children from abuse until the hearing, at which time the plaintiff may seek a temporary order from the court.*

> (c) *Certification of order to court.*—An emergency order issued under this section and any documentation in support thereof *shall be immediately certified to the court* ....

23 Pa.C.S. § 6110 (emphasis added).

By their plain language, stated purposes and judicial interpretation, these statutes are interrelated and operate *in pari materia. See, e.g., In the Matter of Read,* 693 A.2d 607 (Pa.Super.1997) (interrelationship between definitions of child abuse in CPSL and dependency adjudications under Juvenile Act); *Miller by Miller v. Walker,* 445 Pa.Super. 537, 665 A.2d 1252 (1995) (remedies of PFA Act available to victims of child abuse as defined in CPSL); *In the Interest of R.M.R.,* 366 Pa.Super. 243, 530 A.2d 1381 (1987) (reading CPSL, Juvenile Act, PFA Act and criminal statutes *in pari*

*materia* re allegations of child abuse). The time periods for interference with the custody of a child prior to court review/ hearing are quite short under the CPSL and Juvenile Act (24 hours duration for an *ex parte* court order, hearing before a court within 72 hours). While there is no clear statement as to the expiration of an *ex parte* order of custody pursuant to the PFA Act, such an order by a hearing officer must be reviewed by a court on the next business day, and in any event, a court must conduct a hearing, preceded by notice and opportunity to be heard, within ten days of any emergency PFA order. *P.E.S. v. K.L.*, 720 A.2d 487, 488 (Pa.Super.1998) ("If a hearing is not held [within ten days], a trial court lacks jurisdiction to grant relief..."); *Heard v. Heard*, 418 Pa.Super. 250, 614 A.2d 255, 256–57 (1992) ("statute unequivocally provides that a hearing 'shall be held' within ten days of the petition's filing [which] imposes a mandatory limitations period within which hearings must be conducted.").

Moreover, as explicitly stated in the Juvenile Act, the legislature intended to provide for a full and fair hearing for all involved, and to protect the constitutional rights of the parents whose rights to familial integrity are affected. 42 Pa.C.S. § 6301(b)(4). All of the related statutes are recognized by Pennsylvania courts as having been designed, in part, to protect the participants' *constitutional rights to due process of law* before permitting state interference with parental rights/ familial integrity. *See, e.g. In the Interest of M.B.*, 356 Pa.Super. 257, 514 A.2d 599, 601 (1986); *In re Penny R.*, 353 Pa.Super. 70, 509 A.2d 338, 340 (1986); *Roman v. Appleby*, 558 F.Supp. 449, 460–61 (E.D.Pa.1983).

The Superior Court of Pennsylvania has interpreted the interrelated provisions of the CPSL and the Juvenile Act, and has concluded, in no uncertain terms, that the latter is the *exclusive procedure* in Pennsylvania for the state to legally interfere with parental rights on the basis of alleged child abuse. *In re J.R.W.*, 428 Pa.Super. 597, 631 A.2d 1019 (1993).

... The [CPSL] does not provide for legal determinations of abuse; it is mainly a vehicle for reporting abuse and bringing quickly into play those services (including court hearings) available through county protective service facilities for the care of the child.

The [Juvenile] Act, however, is a procedural act which establishes jurisdiction in the courts to legally intervene and make findings of dependency which, in the context of this case, also includes child abuse. While the primary goal of the Act is to preserve and unite the family, it goes far beyond that opening statement of purpose. 42 Pa.C.S. § 6301(b)(1). The Act also requires the court to remove children from the family environment when necessary for their welfare or in the interest of public safety. *In keeping with its purpose, the Act provides a complete procedural vehicle by which children are taken into custody, investigations are made, petitions are filed, hearings are held and remedial work is done to aide the family, to protect the child and, where necessary, to place the child out of the reach of abusive and neglecting parents. The Law and the Act must be read in pari materia.*

\* \* \* \* \* \*

Thus, by mandate of the Law [23 Pa. C.S. § 6324], *the one and only available resource for custody, change of custody or detention of a child who is suspected of being abused under the Law is the Juvenile Court pursuant to the Juvenile Act [42 Pa.C.S. § 6315]* ....

\* \* \* \* \* \*

In summation, *the Juvenile Court is the proper and only judicial body which has the capacity to make a determination that a child is abused and to affect a disposition of that child pursuant to the Act in conjunction with the Law* . . . .

631 A.2d at 1021–23, 1025 (emphasis added).

In *In re M.L.*, 562 Pa. 646, 757 A.2d 849 (2000), Justice Newman observed, consistent with the Superior Court's observations in *In re J.R.W.*, that the "CPSL provides the mechanism for state involvement in a family unit where child abuse is alleged," but noted the PFA Act was an available, *related* mechanism designed in part to achieve the same goal, protecting a child suspected of being abused or in danger of abuse, which could be invoked by the non-custodial parent. *In re M.L.*, 757 A.2d at 852–53 (Justice Newman, joined by Justice Zappala).

**Actual Procedure Followed**

Rather than adhering to the procedures set forth in the CPSL, Juvenile Act or PFA Act, defendants chose "None of the above." Officer Yockey purports to have taken Abby Ferguson into custody momentarily, immediately relinquishing custody to Ms. Bowman, pursuant to the Juvenile Act. Ms. Bowman claims authority to act and to assume custody or control over Abby by virtue of the CPSL and the Juvenile Act. Nevertheless, the *actual mechanism* used to obtain an order from a member of the minor judiciary was the PFA Act, but the safeguards and protections built into that act were ignored.

The first PFA petition on Friday night was flawed on its face, because Abby, a non-emancipated minor, could not fill out a PFA petition in her own right. Nevertheless, the ersatz PFA petition and the district justice's order awarding temporary custody to the non-custodial parent should have triggered an immediate certification of that first order to a court of competent jurisdiction, and that order should have expired by its own terms unless the court held a hearing or reviewed the order and continued it in effect until the hearing. Instead, Ms. Bowman prompted Mr. Ferguson to file a second PFA petition of his own, on Monday morning, *ex parte*, and the district justice entered an order continuing custody with him. Mrs. Patterson was not notified of where her child had been placed. By using this flawed PFA Act procedure, defendants avoided the mandates of the CPSL and Juvenile Act, namely the 24 hour and 72 hour time periods for invoking informal court involvement, and ten days for formal hearing, not to mention the mandatory "next business day" court involvement under the PFA Act where an "emergency petition" has been granted by a member of the minor judiciary because a judge was unavailable.

What happened after November 9, 1998, is cloudy. We know that criminal charges were filed, and on November 23, 1998, withdrawn by the district attorney's office at the scheduled preliminary hearing. We also know that on November 18, 1998, Mr. Ferguson withdrew his PFA petition. And we know that on November 23, 1998, CYS marked its investigation "unfounded" after it reviewed the medical report on Abby's condition from Grove City Hospital. Finally, although the parties do not enlighten the Court, *some kind of hearing* was scheduled before the court at the county courthouse in Kittaning, Pennsylvania, sometime after November 9th but before November 23rd.

The exact nature of this hearing is not explained, although it would have been easy enough to produce some documentation showing what it was and when it was scheduled. Mrs. Patterson testified at her

deposition that she, Mr. Ferguson, Abby Ferguson, her lawyer, and an attorney for Abby, were all present at this hearing, and that *the participants reached an agreement.* (Abby confirmed, during her deposition, some sort of a scheduled meeting/hearing at the courthouse which did not take place, although she was not sure exactly what it was.) The agreement has not been reproduced, but Mrs. Patterson testified the parties agreed custody would continue with Mr. Ferguson for thirty days. An educated guess is that this scheduled hearing was the "ten day" hearing *mandated* by the PFA Act, and that it was scheduled and agreement was reached on November 18, 1998, the day that Mr. Ferguson withdrew his PFA petition.

The Court finds that, from November 9, 1998, through the date of the scheduled hearing, the defendants deprived plaintiffs Kelly Patterson and, perhaps, Abby Ferguson of their **statutory rights** to notice and to a court hearing providing a meaningful opportunity to be heard. Pursuant to the CPSL and the Juvenile Act, (which have been recognized as the exclusive procedures for *state initiated deprivation* of parental rights, *In re J.R.W., In re M.L.*), there should have been an emergency, *ex parte* court proceeding within 24 hours, followed by an informal court hearing, with notice to Mrs. Patterson and perhaps to Abby Ferguson, with meaningful opportunity to be heard, within 72 hours. Even under the PFA Act, there should have been court review of the emergency PFA orders of the district justice on the next business day, meaning November 9th for the first PFA petition (Abby's) and November 10th for the second (Mr. Ferguson's).

Defendants do not really protest that they complied with state law, and plaintiffs rest their procedural due process claim *entirely* on defendants' violation of state laws (the CPSL and the Juvenile Act) and procedures, *particularly* their failure to provide an emergency judicial hearing within 24 hours and a noticed hearing with opportunity to be heard within 72 hours of Abby's being taken into protective custody. *Some sort of process* appears to have been afforded, however, as of the date of the scheduled hearing in the county courthouse.

## Minimum Constitutional Procedural Requirements

Except for a narrow line of cases recognizing a state created liberty interest of prisoner's where the state has failed to follow its own prison laws or administrative regulations,[4] state law does not ordinarily define the parameters of due process for Fourteenth Amendment purposes; rather, the minimum, constitutionally mandated requirements of due process in a given context and case are supplied and defined by federal law, not by state law or regulations. *Davis v. Scherer,* 468 U.S. 183, 194, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984). Plaintiffs rely solely on the clear violation of state law, and make no attempt to show that the failure to follow state mandated procedures violated their *constitutional* rights to due process. This is not enough. *See e.g., Doe v. Connecticut Dep't of Child and Youth Services,* 911 F.2d 868, 869 (2d Cir.1990) (violation of state law regarding removal of child under protective custody neither establishes due process violation under section 1983 nor de-

4. *See, e.g. Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983); *Shoats v. Horn,* 213 F.3d 140 (3d Cir.2000). While this limited principle might possibly be imported into other procedural due process contexts, see *Hicks v. Feeney,* 770 F.2d 375, 380 n. 4 (3d Cir.1985), plaintiffs do not make the argument for extension, or even acknowledge this line of precedent.

prives defendant of qualified immunity); *Weller v. Dep't of Soc. Serv.,* 901 F.2d 387, 392 (4th Cir.1990) ("Even if [the social services agency] did violate state law, it is well settled that violations of state law cannot provide the basis for a due process claim."); *Robison v. Via,* 821 F.2d 913, 922–23 (2d Cir.1987) (violation of state law regarding removal of child under protective custody neither establishes due process violation under section 1983 nor deprives defendant of qualified immunity), *citing Scherer and Loudermill.* It is fair to say defendants do not seriously claim to have complied with state procedures for interference with parental rights, and that they seem content to let sleeping "due process dogs" lie.

*Mathews* supplies the test for determination of the adequacy of the procedures used to deprive plaintiffs' of their rights to familial integrity, and the first factor is a given *there is a protected liberty interest* in such rights. *Croft.* The second factor requires the Court to consider the risk of an erroneous deprivation of that protected interest through the procedures actually used, and the "probable value, if any, of additional or substitute procedural safeguards." *Mathews,* 424 U.S. at 334–35, 96 S.Ct. 893. The third factor considers the state's interest, "including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* While not *dispositive,* the statutory schemes adopted by the Pennsylvania legislature in the familial integrity arena are highly *relevant* to this Court's consideration of the second and third factors.

The "additional or substitute procedural safeguards" that the defendants should have followed in this case were those carefully crafted and interlocking procedures of the CPSL and the Juvenile Act. The "probable value" of following the legisla-

tively mandated procedures, providing for quick judicial review, is in the greatly reduced risk of erroneous interference with parental rights and the integrity of the family unit. Similarly, the legislature obviously considered the fiscal and administrative burdens that would fall on child protective services agencies and local law enforcement officials charged by the CPSL, the Juvenile Act, and the PFA Act with protecting the safety and welfare of children and with safeguarding the constitutional rights of parents and the family, and enacted related legislation **mandating** specific procedural requirements. The Pennsylvania General Assembly must be presumed to have intended those burdens be carried by the appropriate local officials.

Generally, the constitutionally required notice and hearing must should follow *as soon as practicable Goss,* 419 U.S. at 582–83, 95 S.Ct. 729. To determine the precise point at which the delay in providing a post-deprivation hearing becomes an unconstitutional due process violation, *Loudermill,* 470 U.S. at 547, 105 S.Ct. 1487, the "delay cannot be evaluated in a vacuum," *Mallen,* 486 U.S. at 242, 108 S.Ct. 1780, and must take into account the importance of the private interest, the harm to this interest occasioned by the delay, the justification for the delay offered by the Government and its relation to the underlying governmental interest, and finally the likelihood that the interim decision may have been mistaken. *Id.,* 486 U.S. at 241, 108 S.Ct. 1780.

In the third circuit and in the courts of Pennsylvania, no bright line has been drawn demarcating the outer limits of acceptable post deprivation delay in the infringement with parental rights context, although courts have declared the 72 hour hearing of the CPSL and Juvenile Act to

be adequate. *Miller v. City of Philadelphia* states:

> Initiating child custody proceedings by ex parte orders is generally constitutional if a prompt post-deprivation hearing is held. *See, e.g., Jordan v. Jackson,* 15 F.3d 333, 343 (4th Cir.1994) ("Due process ... does not always require prior process."); *Fitzgerald v. Williamson,* 787 F.2d 403, 408 (8th Cir.1986). Pennsylvania's Child Protective Services Law, 23 Pa. Cons.Stat. Ann. § 6301 *et seq.,* and Juvenile Court Act, 42 Pa. Cons.Stat. Ann. § 6301 *et seq.,* require that a hearing be held within seventy-two hours after an *ex parte* hearing that results in a child's removal from the home. *See* 23 Pa. Cons.Stat. Ann. § 6315(d); 42 Pa. Cons.Stat. Ann. § 6332(a). Although we have not considered Pennsylvania's statutory procedure, district courts in this circuit have found it constitutional. *See Miller I,* 954 F.Supp. at 1061 (*citing* various cases in the Eastern District of Pennsylvania).

174 F.3d at 372, n. 4.

Some decisions have *suggested* that the 72 hour limit on protective custody in the absence of judicial review is constitutionally required. *See, e.g., Egervary,* 80 F.Supp.2d at 502 (collecting cases) ("Although there is no bright-line rule for deciding whether a postdeprivation custody hearing is sufficiently prompt, a survey of the case law shows that the delay should be measured in hours and days, not weeks and months."); *Callahan v. Lancaster–Lebanon Intermediate Unit 13,* 880 F.Supp. 319, 333 (E.D.Pa.1994); *Fanning v. Montgomery County CYS,* 702 F.Supp. 1184, 1189–90 (E.D.Pa.1988).

■ As discussed in the next section, some courts of appeals in other circuits have come very close to setting a bright line for the outer limits of the post protective custody judicial hearing at 72 hours.

This Court concurs in the judgment of the Fourth, Eighth and Ninth Circuit Courts of Appeals that ordinarily, 72 hours for the post deprivation (temporary protective custody) judicial review, with notice and meaningful opportunity to be heard, is at the outside tolerance of the Fourteenth Amendment. The unequivocal statutory demarcation set by the Pennsylvania legislature, predicated in part to ensure that "the parties are assured a fair hearing and their constitutional and other legal rights recognized and enforced," 42 Pa.C.S. § 6301(b)(4), substantially increases this Court's comfort level in declaring 72 hours as the maximum time period in which the state may significantly interfere with a parent's rights in the care, custody and relationship with her child without an adequate judicial proceeding providing notice and meaningful opportunity to be heard.

Given the importance of the private interests at stake, given the gravity of the risk of an erroneous decision to take a child into protective custody, given the considered study and evaluation by the Pennsylvania legislature of the need for protection of children's safety and welfare and procedural safeguards for parental rights, and given the legislative judgment and carefully crafted and integrated scheme of protection and enforcement of child protective services laws, this Court now holds, as a requirement of the due process clause of the Fourteenth Amendment, that the state must initiate and provide a judicial hearing, with notice and meaningful opportunity to be heard, within 72 hours of taking a child suspected of being abused into protective custody. The Court further holds that the undisputed failure of defendants in this case, pursuant to the custom, policy or practice of CYS, County and Township, deprived plaintiffs of their rights to procedural due process.

## Qualified Immunity Procedural Due Process

■ The issue of qualified immunity from liability for a procedural due process violation in the protective custody context is a bit more complicated than the substantive due process claim because there was no "clearly established law" in this circuit *precisely* drawing the 72 hour bright line this Court requires today, or any line for that matter. Nevertheless, this Court finds that the law was clearly established on November 6, 1998, that local officials had to provide plaintiffs with a judicial hearing and opportunity to be heard within 72 hours of taking Abby Ferguson into protective custody pursuant to the CPSL and Juvenile Act.

## Clearly Established Law

The parties offer little or nor assistance in proffering likely candidates defining "clearly established law" in the third circuit. With or without their assistance, however, it is the obligation of this Court to identify and consider all relevant precedent, not merely those cited by the parties. *Elder v. Holloway*, 510 U.S. 510, 516, 114 S.Ct. 1019, 127 L.Ed.2d 344 (1994).

■ Violation of state law alone will not deprive an official of qualified immunity, *Davis*, 468 U.S. at 184, 104 S.Ct. 3012, but the explicit mandates of the CPSL and the Juvenile Act certainly served notice on local officials that they were required to conduct a hearing within 72 hours, and these officials were aware of that statutory requirement. As previously referenced, there also was case law in the federal and state courts of Pennsylvania strongly suggesting the *constitutional basis* for this 72 hour limitation. Moreover, the *general principle* of procedural due process *long ago* established that a post deprivation hearing, held at a meaningful time and in a meaningful manner following the depriva-

tion of an important interest, must be conducted *as soon as practicable under all of the circumstances*. *Goss; Mallen; Barry v. Barchi*, 443 U.S. 55, 66, 99 S.Ct. 2642, 61 L.Ed.2d 365 (1979).

The Court of Appeals for the Third Circuit takes a fairly expansive view of what law is clearly established, stating "it is not necessary that there have been a previous precedent directly in point." *Good v. Dauphin County Social Services for Children and Youth*, 891 F.2d at 1092 (citations omitted). Instead, some but not precise factual correspondence to precedent is necessary for an official to be charged with knowledge of the unlawfulness of his or her actions. *Id.; See also Doe v. County of Centre, Pennsylvania*, 242 F.3d 437, 454 (3d Cir.2001) ("Rights may be clearly established even though the precise conduct at issue has not yet been declared unlawful."); *Sterling v. Borough of Minersville*, 232 F.3d 190, 193 (3d Cir.2000) ("A right is clearly established if its outlines are sufficiently clear that a reasonable officer would understand that his actions violate the right."); *Hicks v. Feeney*, 770 F.2d 375, 379–80 (3d Cir.1985) ("This circuit recently rejected the strict standard in favor of a more flexible approach requiring some factual correspondence and demanding that officials apply well developed legal principles to the instant case. *People of Three Mile Island*, 747 F.2d at 144. The standard involves an inquiry into the general legal principles governing analogous factual situations, if any, and a subsequent determination whether the official should have related this established law to the instant situation.").

■ The "clearly established law" element of qualified immunity is flexible enough to embrace clearly established law of other circuits. *See, e.g., Turiano v. Schnarrs*, 904 F.Supp. 400, 414 n. 15 (M.D.Pa.1995) ("Much of the directly appli-

cable case law emanates from outside this circuit, but that is not important. *See Good,* 891 F.2d at 1094–95 (court denied qualified immunity on federal law issues, citing case law from California, Oregon, Wisconsin, Nevada, and South Dakota, stating that 'a prior case on all fours is not necessary'); *People of Three Mile Island [Through Three Mile Island Alert, Inc. v. Nuclear Regulatory Com'rs,* 747 F.2d 139, 146–49 (3d Cir.1984) ] (court granted qualified immunity after analyzing D.C. Circuit case law, inter alia, and deciding that it was unclear)."). *See also Assaf v. Fields,* 178 F.3d 170, 179 (3d Cir.1999) (suggesting that decisions of other circuits may be consulted to determine the state of clearly established law, but not where there is clearly established law in this circuit to serve as guidance on the subject); *Coover v. Saucon Valley School Dist.,* 955 F.Supp. 392, 407 (E.D.Pa.1997) (consulting specific law of other circuits and general law of third circuit to determine law was not clearly established). *But see Johnson v. Horn,* 150 F.3d 276, 286 n. 6 (3d Cir.1998) (collecting cases from other circuits on locating "clearly established law," and indicating it is not entirely free from doubt that courts of this circuit may look to the law of other circuits).

The right to a prompt "as soon as practicable" post deprivation (of a protected liberty interest) hearing was most definitely established before November 6, 1998. *E.g., Goss.* The Court of Appeals for the Fourth Circuit in *Jordan v. Jackson,* 15 F.3d 333, 349 (4th Cir.1994), *cited with approval in Miller,* 174 F.3d at 372, n. 4, clearly established that 72 hours (the approximate duration of a weekend wherein it was not possible to obtain judicial review) was at the outer limits of promptness in the specific context of child protective custody. *Jordan* derived its approximate 72 hour limit from the state statute and due process jurisprudence. *See also*

*Campbell v. Burt,* 141 F.3d 927, 929 (9th Cir.1998) ("Federal case law as of April 1993 (when the children were removed) did not clearly establish that a seven-day delay before obtaining post-deprivation judicial review would violate due process. The relevant case law clearly established constitutional violations only for much longer delays....*Only Jordan, which was decided in 1994, may be said to establish that a relatively short delay (of 65 hours) 'is near, if not at, the outer limit of permissible delay* between a child's removal from his home and judicial review.' 15 F.3d at 351." emphasis added); *Whisman through Whisman v. Rinehart,* 119 F.3d 1303 (8th Cir.1997) ("The right to an adequate post-deprivation hearing was clearly established in February of 1995.... Under the facts of this case, seventeen days was not a prompt hearing."); *Egervary,* 80 F.Supp.2d at 502–03 (collecting pre–1995 cases, and concluding that it was well established that the state must initiate post deprivation (of parental rights) proceedings "in a matter of *hours or days,*" not weeks or months); *Callahan,* 880 F.Supp. at 333 (noting that the 24 hour/ 72 hour time periods of the CPSL and the Juvenile Act adequately protect parent's rights to due process, including right to be heard at a meaningful time and in a meaningful manner).

**Objective Reasonableness of Individual Defendants' Conduct**

Thus, in November, 1998, defendants were charged with knowing, and in fact did know, that Pennsylvania law required a judicial hearing be held to review the propriety of taking Abby Ferguson into protective custody within 72 hours, and that the statutory procedures were intended to safeguard the parent's constitutional rights to familial integrity and due process of law. If there were any doubt, *Jordan* clearly established this minimum proce-

dural due process requirement of the Fourteenth Amendment in 1994. While legal advice by the district attorney might have provided qualified immunity for the individual defendants regarding the substantive due process claim and the decision to take Abby into protective custody in the first instance, defendants do not claim to have solicited or received any legal advice supporting their decision not to initiate a judicial review hearing, with notice and meaningful opportunity to be heard, within 72 hours.

In short, it was not objectively reasonable in November, 1998, for the defendants to take Abby into protective custody without providing plaintiffs with a prompt and adequate judicial hearing within 72 hours. Their failure to do so not only violated state law, it also violated clearly established federal constitutional precedent.

### Extent of Procedural Due Process Deprivation

The record placed before the Court is ambiguous as to the nature of the hearing subsequently scheduled in the courthouse in Kittaning and as to the date it was scheduled, except that it was after November 9th and before November 23rd. Assuming the scheduled hearing would have afforded plaintiffs a meaningful opportunity to be heard, and assuming the parties reached an arms length agreement on that day that Abby would remain in her father's custody for another 30 days, then it would seem that any procedural due process deprivation would have ceased on that day.

It also would seem, if those assumptions prove accurate, that plaintiffs' damages from such a procedural due process violation would be measured from the expiration of the 72 hour period (around 5:00 p.m., on November 9, 1998) through the date of that scheduled hearing. Resolution of this issue must await trial, and as

previously noted, may have a direct impact on determination of plaintiffs' damages stemming from the procedural due process violation.

■ As in any case, plaintiffs must prove that their damages resulted from the constitutional injury inflicted by defendants. *See Carey v. Piphus,* 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978) (ordinarily, there are no presumed damages for procedural due process violation, and plaintiff must allege and prove actual damages). *See generally* Nahmod, S., *Civil Rights and Civil Liberties Litigation, The Law of Section 1983,* § § 4.6–4.14, 4.23–4.27, 4.53 (West Group 4th ed.). Plaintiffs have a difficult task ahead of them in establishing damages from the procedural due process violation and differentiating those damages from the damages resulting from the lawful act of taking Abby Ferguson into protective custody in the first instance. That issue is not presently before the Court. Absolute precision will not be required, but plaintiffs must give the fact finder a reasonable foundation upon which to measure and assess damages.

This case will proceed to the jury on plaintiffs Kelly Patterson's and Abby Ferguson's procedural due process claim, but the substantive due process claim will be dismissed with prejudice. Plaintiffs' remaining claims must also be dismissed with prejudice.

### CYS Not Independent Entity for Purposes of Section 1983

■ The Court agrees with CYS that it is merely a sub-unit of the responsible municipality, the County, which is a party to this suit, and that it therefore should be dismissed from this civil rights action, even as to the procedural due process claim. *See, e.g. Bonenberger v. Plymouth Township,* 132 F.3d 20, 25 n. 4 (3d Cir.1997) ("we treat the municipality and its police

department as a single entity for purposes of section 1983 liability."); *Regalbuto v. City of Philadelphia*, 937 F.Supp. 374 (E.D.Pa.1995); *Johnson v. City of Erie*, 834 F.Supp. 873, 878–79 (W.D.Pa.1993) ("we reject plaintiffs' argument that each governmental sub-unit or department is a person distinct from the government at large. The City of Erie Police Department is a sub-unit of the city government and, as such, is merely a vehicle through which the city fulfills its policing functions."); *Marshall v. Borough of Ambridge*, 798 F.Supp. 1187, 1196 (W.D.Pa. 1992) ("the police department is an arm of the borough, and in order to simplify the case for a jury, summary judgment will be granted in favor of the Ambridge Borough Police Department.").

**Malicious Prosecution**

██ To the extent plaintiffs' complaint and amended complaint raise a substantive due process claim under the rubric of malicious prosecution, under 42 U.S.C. § 1983, that claim is foreclosed by *Albright v. Oliver*, 510 U.S. 266, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994). *Merkle v. Upper Dublin School Dist.*, 211 F.3d 782, 791–92 (3d Cir.2000). To the extent that the section 1983 malicious prosecution claim is predicated on other constitutional grounds, plaintiffs must demonstrate the elements of the common law tort of malicious prosecution, which includes that the defendants acted maliciously or for purposes other than bringing the plaintiff to justice in initiating a criminal proceeding against Kelly Patterson. *Merkle*, 211 F.3d at 792, *citing Lee v. Mihalich*, 847 F.2d 66, 69–70 (3d Cir.1988). This element is distinct from the separate element, lack of probable cause to initiate criminal charges.

██ Even assuming defendants lacked probable cause to charge (or participate in the charging of) Mrs. Patterson with sim-

ple assault, harassment and disorderly conduct, the record is devoid of any evidence showing malice or improper motive on the part of defendants. Contrary to the malicious inferences plaintiffs perceive from defendants' conduct, the record indicates they acted only in furtherance of their official duties under the CPSL and the Juvenile Act. Neither of the individual defendants knew Mrs. Patterson in any significant way on November 6, 1998, and even if part of their decision making process on that day was based upon their erroneous perception of Mrs. Patterson's "hostility" toward them and her "attitude," as plaintiffs infer, that perception occurred in the course of performance of their official duties and does not suffice to show malice. Moreover, without going into the elements of the crimes charged, there appears to have been probable cause to charge Mrs. Patterson.

**Pendent State Claims**

██ Plaintiffs clarify that their pendent state claims (for intentional infliction of emotional distress, negligence, civil conspiracy, malicious prosecution and loss of consortium) are brought only against the individual defendants. These defendants argue convincingly that plaintiffs cannot and have not demonstrated various elements of these state common law claims, and plaintiffs have made only half-hearted attempts to support these claims, factually or legally. On the merits, these pendent state claims seem to be on shaky grounds, but the Court does not reach the merits. Instead, the Court holds that the state common law claims are barred by the statutory official immunity provided by the Pennsylvania Political Subdivisions Tort Claims Act ("PSTCA").

Except for the specific enumerated acts set out in section 8542(b), none of which are relevant here, local agencies are im-

mune from suit under the PSTCA for the negligent and intentional torts of their employees and officials, and individual employees and officials enjoy statutory immune from common law liability to the same extent that their employing entity is immune. 42 Pa.C.S. § 8545. However, section 8550 specifically states that where a municipal employee's actions amount to crime, actual fraud, actual malice or willful misconduct, the employee will lose the immunity protection provided by section 8545, *inter alia.* 42 Pa.C.S. § 8550. *See Wade v. City of Pittsburgh*, 765 F.2d 405, 411–12 (3d Cir.1985). Thus, it must be decided whether plaintiffs have stated, and supported with record evidence, their claims that the individual defendants acted with actual malice or committed "willful misconduct" as contemplated by section 8550. *Owens v. City of Philadelphia*, 6 F.Supp.2d 373, 394 (E.D.Pa.1998)

As stated above, plaintiffs have not supported their bare assertions that defendants acted with malice in taking Abby Ferguson into protective custody or in failing to initiate a noticed hearing within 72 hours as required by the constitution. Neither can they show "willful misconduct" under section 8550.

In *Renk v. City of Pittsburgh*, 537 Pa. 68, 641 A.2d 289, 294 (1994), the Pennsylvania Supreme Court applied and interpreted section 8550's "willful misconduct" exception in the context of police misconduct, and concluded that it meant "misconduct which the perpetrator recognized as misconduct and which was carried out with the intention of achieving exactly that wrongful purpose." *See In Re City of Philadelphia Litig.*, 938 F.Supp. 1264, 1273 (E.D.Pa.1996). The Pennsylvania Supreme Court previously defined the phrase "willful misconduct" to include conduct through which the actor desired to bring about the result that followed or at least

was aware that it was substantially certain to follow, so that such desire can be implied. *Cf., Evans v. Philadelphia Trans. Co.*, 418 Pa. 567, 212 A.2d 440 (1965). Courts interpreting the phrase have uniformly held that merely negligent acts cannot constitute willful misconduct. *See, e.g., Willowby v. City of Philadelphia*, 1996 WL 285410 (E.D.Pa.1996); *Weinstein v. Bullick*, 827 F.Supp. 1193 (E.D.Pa.1993). Plaintiffs have neither alleged nor shown the requisite level of scienter. Accordingly, all of plaintiffs' pendent state claims must be dismissed with prejudice.